# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| LDT KELLER FARMS, LLC, and<br>KELLER FARMS PARTNERSHIP, | ) )<br>) |
| Plaintiffs, | ) ) |
| v. | ) CAUSE NO.  1:08-CV-243<br>) |
| BRIGITTE HOLMES LIVESTOCK CO., INC.,<br>BRIGITTE HOLMES, SAMUEL STEPHEN<br>HOLMES, and MERVIN MISHLER, | )<br>)<br>) |
| Defendants. | ) )<br>) |

## OPINION AND ORDER

This matter is before the Court on the Defendants' Motion for Partial Summary Judgment.[1] (Docket # 60.)  Defendants Brigitte Holmes Livestock Company ("BHLC"), Steve Holmes ("Steve"), and Mervin Mishler ("Mervin") seek summary judgment on Counts II, IV, VIII, and X of the Plaintiffs' Second Amended Complaint, while Defendant Brigitte Holmes ("Brigitte") seeks summary judgment on Counts II, IV, VI, VIII, and X.[2]  For the following reasons, the motion will be GRANTED IN PART and DENIED IN PART.

## I.  FACTUAL AND PROCEDURAL HISTORY[3]

LDT Keller Farms, LLC and the Keller Farms Partnership (collectively, "the Plaintiffs")

---

[1] Levi Graber, Joseph Graber, and Freeman Raber were originally named as defendants as well, but were voluntarily dismissed with prejudice on December 9, 2009. (Docket # 55.)  Accordingly, Counts I, III, V, VII, and IX of the Second Amended Complaint are no longer before the Court.

[2] Because the four defendants are subject to varying standards of liability, the Court will generally address each defendant's arguments separately.  For ease of reading, however, any reference to "the Defendants" refers collectively to BHLC, Steve, Mervin, and Brigitte.

[3] In evaluating the Defendants' motion, the Court must "view the record and all reasonable inferences drawn therefrom in the light most favorable to the [Plaintiffs]." *Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

operate a dairy farm in Northwest Ohio. Luke Keller, Daniel Keller, and Timothy Keller are the sole members of LDT Keller Farms, LLC and each have an equal share in the Keller Farms Partnership. (Second Am Compl. ¶ 1.) BHLC is an Indiana corporation and registered commercial dealer of livestock. (Second Am. Compl. ¶ 2.) Brigitte Holmes is the sole shareholder and President of BHLC. (Second Am. Compl. ¶ 3.) Steve Holmes, Brigitte's husband, is employed by BHLC. (Second Am. Compl. ¶ 4.) Mervin Mishler is also employed by BHLC as a sales agent and to provide stockyard services. (Second Am. Compl. ¶ 5.)

Between October 27, 2006, and January 31, 2007, the Plaintiffs purchased a total of 197 calves from BHLC,[4] ostensibly for use in their dairy operation. The sales contracts provided that the Plaintiffs were purchasing "Holstein heifers." (*See* Docket # 61, pgs. 40-49.) Holstein is a breed of cattle that is well known for its ability to produce milk. *See Painter v. State*, 848 A.2d 692, 695 n.1 (Md. Ct. Spec. App. 2004). A heifer is a female calf that has not yet reproduced. *See E. Dillingham*, *Inc. v. United States*, 70 Cust. Ct. 141, 150 (Cust. Ct. 1973).

After the Plaintiffs took possession of the calves and as they matured and were able to be more thoroughly examined, the Plaintiffs discovered that nearly all the calves were freemartins. A freemartin is a sterile heifer (that is, it has not, and will never reproduce) and is therefore useless as a dairy cow.[5] Because the calves would never be able to reproduce and produce milk, their intended purpose, the Plaintiffs sold them for slaughter.

---

[4] The Plaintiffs dispute that BHLC was the actual seller of the livestock. As will be discussed, however, this argument is unpersuasive and without basis in the record.

[5] Freemartinism is the natural consequence of a mixed-sex set of twins. While the embryos are developing, their blood vessels may become interconnected and allow male hormones from the male calf to circulate inside the female embryo, thereby sterilizing it. Genetic tests, which can be expensive, can determine if a female is a freemartin, as can a physical examination. One type of physical examination must be done while the calf is a newborn, while the other can only be done once the calf has reached sexual maturity. Accordingly, there is a window of time in which it is not possible to physically examine the calf and determine if it is a freemartin.

Accordingly, on October 17, 2008, the Plaintiffs filed suit against BHLC, Brigitte, Steve, and Mervin, alleging breach of contract (Count II), breach of the implied warranty of fitness for a particular purpose (Count IV), violation of the Packers and Stockyards Act, 7 U.S.C. § 213 (Count VI), fraud and fraudulent concealment (Count VIII), and constructive fraud (Count X).[6] (Second Am. Compl. ¶¶ 88-117.)  The Plaintiffs assert that the Defendants represented that the calves were "dairy replacement Heifers" and could reproduce and produce milk for their dairy operation.  The Defendants responded that the Plaintiffs knew the calves were being sold simply as "Holstein heifers" with no guarantee of breedability and the Plaintiffs assumed the risk that they would not be able to produce any milk. (Answer ¶ 8.)  On February 26, 2010, the Defendants filed the present Motion for Partial Summary Judgment.  BHLC, Steve, and Mervin ask for summary judgment on Counts II, IV, VIII, and X, while Brigitte asks for summary judgment on all counts.[7]  With the briefing on the motion complete, the Court will address each of the Defendants' arguments in turn.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

---

[6] In an apparent typographical error, the Plaintiffs have also entitled Count X as "Fraud and Fraudulent Concealment," when it actually advances their claim for constructive fraud.

[7] Only Brigitte is moving for summary judgment on Count VI.  Accordingly, the Plaintiffs' claims against BHLC, Steve, and Mervin under the Packers and Stockyards Act remain for trial. *See* 7 U.S.C. § 209(a) (providing for a private right of action for violations of the Act); *Gerace v. Utica Veal Co., Inc.*, 580 F.Supp. 1465, 1469 (N.D. N.Y. 1984) (noting that the statute was amended to allow for a private right of action).

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).

When ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder." *Payne*, 337 F.3d at 770. The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*; *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable fact finder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### III. DISCUSSION

The Defendants advance several theories in support of granting them summary judgment on Counts II, IV, VI, VIII, and X. The Court will consider each argument seriatim.

**A. Count II: Breach of Contract**.

1. *BHLC's Request for Summary Judgment*.

BHLC claims that it is entitled to summary judgment because it did not breach the sales contracts. It argues that the contracts unambiguously obligated it to only sell the Plaintiffs "Holstein heifers," as opposed to "breedable, or non-freemartin, heifers." (Br. in Supp. 9.) The

Plaintiffs offer several cursory arguments in favor of denying summary judgment that largely miss the mark. On the other hand, the Plaintiffs' argument that the contract is ambiguous as to the precise nature of the calves to be sold has merit. Accordingly, summary judgment on Count II must be denied and the issue tried before a jury.

Under Indiana law, the goal of contract interpretation is to ascertain the intent of the parties. *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 906 (Ind. 2004).[8] In the case of a written contract, the parties' intent is determined by looking first to the plain and ordinary meaning of the contract language. *USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997). If the language of a contract is "clear and unambiguous," the court shall give that language "its plain and ordinary meaning." *Barclay v. State Auto Ins. Cos.*, 816 N.E.2d 973, 975 (Ind. Ct. App. 2004). If, however, reasonable people could come to different conclusions about the meaning of the language, the contract is ambiguous. *Ind. Mills & Mfg., Inc. v. Evenflo Co., Inc.*, No. 1:04-cv-540, 2005 WL 3150164, at *5-6 (S.D. Ind. Nov. 22, 2005). "Whether a contract is ambiguous is a question of law for the court." *W. Ohio Pizza, Inc. v. Clark Oil & Refining*, 704 N.E.2d 1086, 1091 (Ind. Ct. App. 1999).

There are two types of contract ambiguity: patent or latent. Patent ambiguity is apparent on the face of the instrument and arises from inherently contradictory or nonsensical language that either conveys no definite meaning or a confused meaning. *Bradley v. W. & S. Fin. Group*, No. 2:05-cv-39, 2005 WL 2709282, at *6-7 (N.D. Ind. Oct. 20, 2005); *Oxford Fin. Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1143 (Ind. Ct. App. 2003). Conversely, a latent ambiguity, "arises not upon the face of the instrument by virtue of the words used but emerges in attempting to

---

[8] The sales contracts expressly state that they will be governed by Indiana law and neither party asserts otherwise. (*See* Docket # 41, pgs. 40-49.)

apply those words in the manner directed in the instrument." *Hauck v. Second Nat'l Bank of Richmond*, 286 N.E.2d 852, 862 (Ind. Ct. App. 1972).

Extrinsic evidence is admissible to explain the meaning of latent ambiguity, but is not admissible to explain patent ambiguity. *Eckart v. Davis*, 631 N.E.2d 494, 498-99 (Ind. Ct. App. 1994). Patent ambiguity presents a pure question of law, while the jury resolves latent ambiguity as a question of fact. *Felker v. Sw. Emergency Med. Serv.*, *Inc.*, 521 F. Supp. 2d 857, 867 (N.D. Ind. 2007). *See also Fresh Cut*, *Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995) ("[If] the contract is [latently] ambiguous and uncertain in its terms, we believe that the meaning of the contract may well need to be determined by extrinsic evidence. As such, its construction is a matter for the fact-finder. Rules of contract construction and extrinsic evidence need to be employed to determine and give effect to the parties' reasonable expectations. Under such circumstances, resolution of this issue is inappropriate for summary judgment.").

In its motion for summary judgment, BHLC argues that the contract unambiguously requires it to only deliver "Holstein heifers" to the Plaintiffs. According to BHLC's interpretation of the contract term "Holstein heifer," the calves need not be "breedable, or non-freemartin heifers" or otherwise suitable for milk production. (Br. in Supp. 9.) Rather, as BHLC sees it, a "Holstein heifer" simply means a female calf of the breed Holstein that has not yet reproduced. Because the Plaintiffs did technically receive Holstein heifers, BHLC claims it did not breach the sales agreement, even though nearly all of the calves they sold were freemartins and were thus biologically incapable of reproducing and producing milk. In response, the Plaintiffs argue that summary judgment should be denied because the contract is ambiguous. According to their interpretation, BHLC knew they were looking to purchase calves for their

dairy herd and the contract term "Holstein heifer" means a calf that, although its breedability cannot be absolutely guaranteed, would generally be capable of milk production.

The Plaintiffs' argument has merit and the latent ambiguity of the contract term "Holstein heifer" precludes a grant of summary judgment. The word "heifer" in and of itself, is not patently ambiguous—that is, it is not inherently contradictory or nonsensical. *See Bradley*, 2005 WL 2709282, at *6-7. Rather, it simply means a female bovine calf that has not yet reproduced. The ambiguity, however, arises when the term "heifer" is modified by the addition of "Holstein"—a breed of cattle used primarily for milk production. According to the Holstein Association USA, "Holstein cattle are most quickly recognized by their distinctive color markings and outstanding milk production." Holstein Association USA, *Holstein Breed Characteristics*, http://www.holsteinusa.com/holstein_breed/breedhistory.html (Last visited June 22, 2010). Furthermore, the Holstein Association instructs that "Holstein dairy cattle dominate [the] milk production industry [in the United States]" and that nine out of every ten dairy farmers currently milk Holsteins. *Id*.

As such, the use of the phrase "Holstein heifers" in the contract, as opposed to "beef heifers" or "veal calves," strongly implies that the calves are being sold for their ability to produce milk. However, a heifer, in and of itself, is simply a female calf that has not yet reproduced and may never do so. The contract is therefore ambiguous as to the precise nature of the calves that BHLC was contracting to sell. Specifically, it is unclear whether BHLC was contracting to sell calves that *would* be suitable for milk production (and must therefore not be freemartins), or calves that merely *could* be suitable for milk production (and whose status as freemartins was unknown), or calves that would only be suitable for slaughter (and therefore

7

could be exclusively freemartins).

Although the description and classification of cattle has generated surprisingly little precedent—and the parties certainly do not direct the Court to any applicable authority—at least one other court has recognized the difficulties presented by the term "heifer." In *E. Dillingham, Inc. v. United States*, the United States Customs Court considered whether, for import tariff purposes, a "[Holstein] heifer with calf for the first time" is a "cow." 70 Cust. Ct. at 142. But even that Court did not directly address the question of whether the term "heifer" necessarily implies that the calf *will* be able to reproduce and produce milk, or simply means that it has *not yet* given birth.

With the latent ambiguity regarding whether BHLC was contracting to sell Holstein calves that would be fit for dairy production, summary judgment on Count II is inappropriate. Rather, it is for the fact finder to consider the parties' extrinsic evidence, identify the precise nature of the calves that BHLC contracted to sell, and thus decide whether BHLC breached its contract with the Plaintiffs.

2. *Steve and Mervin's Request for Summary Judgment*.

Steve and Mervin claim that they cannot be held liable for breach of contract because they are not parties to the sales contracts. They are apparently arguing that, as agents of BHLC, they cannot be liable for its alleged breach of contract. In an effort to hold them personally liable, the Plaintiffs offer a specious and poorly-developed argument that Steve and Mervin were not acting as agents of BHLC, but were actually part of an undisclosed entity, "Holmes Livestock Co., Inc.," which they believe is a partnership between BHLC, Brigitte, Steve, and Mervin. Accordingly, they believe that Steve and Mervin, as partners of "Holmes Livestock

Co., Inc.," are personally liable on the sales contracts. (Pls.' Resp. 23.) The Defendants' argument, however, is persuasive and Steve and Mervin will be granted summary judgment in their favor on Count II.

It is well-established that an agent who contracts on behalf of a disclosed principal and acts within the scope of authority, is not personally liable to the other contracting party for the principal's breach of contract. *Carlson Wagonlit Travel*, *Inc*. *v*. *Moss*, 788 N.E.2d 501, 503 (Ind. Ct. App. 2003). An agent may become liable by virtue of an agreement or circumstances showing that he expressly or impliedly incurred or intended to incur personal responsibility. *McDonald v. Smart Prof. Photo Copy Corp*., 664 N.E.2d 761, 764-65 (Ind. Ct. App. 1996). Stated differently, where an agent acts within the scope of the agent's authority in signing a contract on behalf of a disclosed principal, the remedy of the party seeking to enforce the contract is against the principal and not the agent.

In response, the Plaintiffs offer the undeveloped argument that Steve and Mervin can be personally liable on the sales contracts, because they were not actually agents of BHLC, but were, along with BHLC and Brigitte, actually partners in a different entity, "Holmes Livestock Co., Inc." In support of this claim, however, the Plaintiffs offer accusations and assumptions, but not a single piece of *evidence* suggesting that "Holmes Livestock Co., Inc." exists or that Steve and Mervin were acting on behalf of this undisclosed principal.[9]

To the contrary, Luke Keller testified during his deposition that he did not believe he was

_____

[9] The Plaintiffs' argument apparently stems from the fact that the sales contracts are captioned as being from the "Holmes Livestock Co., Inc." (*See* Docket # 61, pgs. 40-49.) As will be discussed, however, the Plaintiffs' own deposition testimony reveals that they did not believe they were contracting with Steve, Mervin, or Brigitte individually. Furthermore, although the Plaintiffs repeatedly argue that this new company exists, they point to no actual evidence that the "Holmes Livestock Co., Inc." is a distinct legal entity.

purchasing any calves from Brigitte, Steve, or Mervin individually. (L. Keller Dep. 134:19-135:1.)[10]  Indeed, elsewhere in their opposition to the motion for summary judgment, the Plaintiffs frequently refer to Steve and Mervin as agents of BHLC. (*See* Br. in Opp'n. 16.)

With the undisputed material facts showing that Steve and Mervin were only acting as agents for their disclosed principal, BHLC, they cannot be personally liable for BHLC's alleged breach of contract. *See Carlson Wagonlit Travel*, 788 N.E.2d at 503 ("[W]here an agent discloses the identity of his principal and does not exceed his authority when contracting on the principal's behalf, the agent is not personally bound by the contract unless the agent agrees to be so bound.") (internal citations and quotations omitted).  The Plaintiffs point to no evidence to suggest that Steve and Mervin could be personally liable because they acted outside the scope of the authority given to them by BHLC.  Accordingly, because the undisputed evidence shows that Steve and Mervin were acting as agents within the scope of authority given to them by BHLC, they will be granted summary judgment with respect to Count II.

**B. Count IV: Breach of Warranty**.

1. *BHLC's Request for Summary Judgment*.

BHLC next claims that it should be granted summary judgment because the Plaintiffs failed to give notice of the alleged breach of warranty as required by Indiana Code § 26-1-2-

---

[10] The Plaintiffs have filed two identically-worded "supplemental" affidavits, one from Luke Keller and the other from Dan Keller, both dated April 7, 2010. (Docket # 68.)  In their affidavits, the Kellers attempt to "clarify" their earlier deposition testimony and now state that at all times they believed they were dealing with "Holmes Livestock Company, Inc." instead of BHLC.  These affidavits are in direct contradiction of their earlier deposition testimony and thus are not properly before the Court. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001) ("[A] party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony."); *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 532-33 (7th Cir. 1999) ("It is a well-settled rule . . . that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition."); *GSS Salvage v. Alter Trading Corp.*, No. 08-3007, 2009 WL 1392073, at *2 (C.D. Ill. May 14, 2009) (disregarding affidavit that directly contradicted an earlier deposition).

607(3)(a). It concedes that the Plaintiffs did notify it on February 1, 2007, that seven calves purchased on January 31, 2007, turned out to be freemartins. (Br. in Supp. 12.)[11] BHLC argues, however, that the Plaintiffs failed to notify it when they determined that the remaining calves were predominately freemartins, around May 2, 2007, and instead simply filed suit some eighteen months later. Accordingly, BHLC argues that the Plaintiffs are statutorily barred from bringing a breach of warranty claim with respect to all but the seven calves for which notice was provided. For the seven calves for which BHLC admits it did receive notice, it argues that it effectively disclaimed any warranty. In response, the Plaintiffs ignore BHLC's claim that they failed to give notice and simply assert that the warranty was not effectively disclaimed.

Indiana's version of the Uniform Commercial Code creates an implied warranty of fitness for a particular purpose.

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under IC 26-1-2-316, an implied warranty that the goods shall be fit for such purpose.

Ind. Code § 26-1-2-315.

The existence of an implied warranty is generally a question of fact to be determined by examining the circumstances under which the parties contracted. "[T]he buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists." Ind. Code § 26-1-2-315, cmt.1.

---

[11] The sales records submitted by the parties apparently show two different transactions that occurred on January 31, 2007. The first transaction, Invoice # 2025, was for fifteen calves at $200 each, along with veterinary services worth $147.29. Invoice # 2038 documents a sale of 7 calves, also at $200 each. (*See* Docket # 61, pgs. 48, 49.)

In order to maintain a claim for breach of the implied warranty of fitness for a particular purpose, the buyer must provide the seller with notice of the alleged breach. "Where a tender has been accepted: the buyer must, within a reasonable time after he discovers or should have discovered any breach, notify the seller of the breach *or be barred from any remedy*." Ind. Code § 26-1-2-607(3)(a) (emphasis added). "The content of the notification 'need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched.'" *Artistic Carton Co. v. Thelamco, Inc.*, No. 1:06-cv-316, 2009 WL 3060205, at *4 (N.D. Ind. Sept. 22, 2009) (quoting Ind. Code § 26-1-2-607(3)(a), cmt. 4). Alleging that notice was given is a condition precedent to a breach of warranty claim and the failure to give notice waives any right to assert a breach. *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E.2d 546, 554 (Ind. Ct. App. 1987); Ind. Code § 26-1-2-607(3)(a).

Additionally, under Indiana's version of the UCC, "[t]he seller in all cases is free to disclaim warranties in the manner provided in Section 2-316." Ind. Code § 26-1-2-719, cmt. 3. To disclaim an implied warranty of fitness for a particular purpose, the disclaiming language must be in writing and be conspicuous. Ind. Code § 26-1-2-316(2). "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals . . . is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color." Ind. Code § 26-1-1-201(10). *See also Wilson v. Royal Motor Sales, Inc.*, 812 N.E.2d 133, 137 (Ind. Ct. App. 2004); *Roberts v. Homelier Div. of Textron, Inc.*, 649 F.Supp. 1440, 1444-45 (N.D. Ind. 1986). Whether the disclaimer is satisfactorily conspicuous is a question of law to be determined by the Court. Ind. Code § 26-1-1-201(10).

In their Response Brief, the Plaintiffs completely ignore BHLC's argument that they are barred from asserting a breach of warranty claim because they failed to give notice for all but seven of the calves and, apparently, concede that summary judgment is warranted on this basis. *See Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (reiterating that arguments not responded to in a summary judgment response are waived); *Kowalczyk*, 2005 WL 1176599, at *11 (N.D. Ill. May 17, 2005) (collecting cases). Accordingly, BHLC is entitled to summary judgment on Count IV, except with respect to the seven calves purchased on January 31, 2007.

With regard to the seven calves for which BHLC admits it received notice, summary judgment is inappropriate because the implied warranty was not effectively disclaimed. The purported warranty disclaimer provides as follows:

> All livestock and goods are sold "AS IS" and "WITH ALL FAULTS"; Seller makes no guaranty, warranty, or representation, expressed or implied (including any regarding the merchantability or fitness for a particular purpose), as the kind, size, weight, quality, character, health, description or condition, pregnancy, of any of the livestock or goods. [sic]

(Docket # 61, pg. 40.)

Far from being conspicuous, the disclaimer was placed at the bottom of the page, in type much smaller than the rest of the contract. Although the clause does contain the phrase "fitness for a particular purpose," only the "as is" and "with all faults" language was presented in all capitalized letters. *Cf. Royal Motor Sales, Inc*., 812 N.E.2d at 137-38 (finding that disclaimer in all capitalized letters was effective). Furthermore, the text was not presented in bold font or in contrasting color. *Cf. Hahn v. Ford Motor Co*., *Inc*., 434 N.E.2d 943, 948 (Ind. Ct. App. 1982) (finding disclaimer that appeared in bold face type effective); *see* Ind. Code § 26-1-1-201(10). Accordingly, the Court finds that, as a matter of law, BHLC's attempted disclaimer of the

implied warranty of fitness for a particular purpose was not effective. BHLC's request for summary judgment on Count IV is therefore denied with respect to the seven calves for which BHLC did receive notice.

To summarize, the Plaintiffs' claim for breach of the implied warranty of fitness for a particular purpose fails with respect to all the calves (except the seven purchased on January 31, 2007) due to a failure to give the statutorily-required notice of breach. Accordingly, BHLC is entitled to summary judgment on Count IV with respect to these calves. BHLC did not, however, effectively disclaim the implied warranty for the remaining seven calves purchased on January 31, 2007, and its request for summary judgment must therefore be denied with respect to them.

2. *Steve and Mervin's Request for Summary Judgment*.

Steve and Mervin also claim that they are entitled to summary judgment on the Plaintiffs' breach of warranty claim. They argue that they cannot be liable for the alleged breach of warranty because they were not the seller of the calves, but were rather acting on behalf of BHLC. The Plaintiffs again respond with the summary argument that Steve and Mervin were actually partners in the "Holmes Livestock Company, Inc." and can therefore be personally liable.

As discussed in Section A, the undisputed material facts show that Steve and Mervin were acting on behalf of their disclosed principal, BHLC. Although an agent who acts on behalf of an undisclosed principal may be personally liable for breach of an implied warranty, *see* 12 WILLISTON ON CONTRACTS § 35:43 (4th ed. 2007), the Plaintiffs offer no case law or secondary source—or even generalized argument—to suggest that, absent an agreement to the contrary, an

14

agent may be personally liable for its disclosed principal's breach of warranty. Accordingly, Steve and Mervin are entitled to summary judgment with respect to Count IV.

**C. Count VIII: Fraud and Fraudulent Concealment and Count X: Constructive Fraud**.

The Defendants collectively move for summary judgment on both of the Plaintiffs' fraud claims. They argue that the Plaintiffs cannot claim fraud because the sales agreements contain a valid integration clause by which the Plaintiffs expressly disavowed any reliance on representations allegedly made to them that the calves were not freemartins. (Br. in Supp. 14.) If the Plaintiffs have agreed that they did not rely on any other statements except those contained in the contract (which expressly disclaims any guarantee that the calves could reproduce), then, or so the Defendants argue, they cannot show the required element of reliance on a fraudulent statement.

The Plaintiffs respond with a meandering exploration of the elements of their fraud claim, but largely skirt the issue of their potential disclaimer of reliance. Rather, they broadly claim that the parol evidence rule does not prohibit the introduction of the Defendants' allegedly fraudulent statements. Because the Plaintiffs effectively disclaimed any reliance on outside representations made concerning the breedability of the calves, parol evidence may not be introduced to show their reliance on the alleged fraud.

The exclusion of parol evidence, however, does not necessarily entitle the Defendants to a blanket grant of summary judgment. The jury could conclude that they committed fraud based purely on the terms contained in the sales contracts. As discussed previously, the contract term "Holstein heifer" is ambiguous; and so, while the jury could conclude that it simply means a female Holstein calf that has not reproduced, they could also find that it means a calf that is

being sold for dairy production. If the jury finds the latter definition to be the correct one, they would then be entitled to consider whether the Defendants committed fraud by selling calves that turned out to be almost exclusively freemartins.

1. *Parol Evidence May Not Be Used to Prove Reliance on the Alleged Misrepresentation.*

The Defendants argue that the Plaintiffs are barred from introducing parol evidence to prove their supposed reliance on representations that the calves were not freemartins because the sales contacts contain an enforceable integration clause and disclaimer of reliance. The Plaintiffs do not address the Defendants' argument and instead focus their efforts on proving the actual elements of their fraud claims.

To establish actual fraud, the Plaintiffs must establish: (1) a material representation of a past or existing fact which; (2) was false; (3) was made with knowledge or reckless ignorance of its falsity; (4) was made with the intent to deceive; (5) was reasonably relied upon by the complaining party, and; (6) proximately caused injury to the complaining party. *Bilimoria Computer Sys.*, *LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 155 (Ind. Ct. App. 2005). Similarly, constructive fraud requires: (1) a duty owed by the party to be charged to the complaining party due to their relationship, (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists, (3) reasonable reliance thereon by the complaining party, (4) injury to the complaining party as a proximate result thereof, and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Wheatcraft v. Wheatcraft*, 825 N.E.2d 23, 30 (Ind. Ct. App. 2005).

In the present case, the sales contracts contain the following clause:

Purchaser has not replied [sic][12] upon or been induced by any statements or representations of any person regarding the livestock or goods other than those statements and representations expressly set forth in writing hereon. Purchaser has been afforded the opportunity for full and complete investigations, examination and inspection of the livestock and goods.

(*See* Docket # 41, pgs. 40-49.)

In signing the sales contracts therefore, the Plaintiffs specifically agreed that they were not relying on any representations made by the Defendants other than those expressly made in the contract, which twice disclaims any guarantee that the calves will be able to breed. *Id*. The Plaintiffs further agreed that the waiver was made after they had the opportunity to conduct a complete investigation of the calves they were purchasing. *Id*. Based solely on the parties' agreement, therefore, the Plaintiffs' are barred from introducing parol evidence to prove the required elements of reliance on a fraudulent statement. That is, the Plaintiffs cannot claim that they relied on a fraudulent oral statement made during negotiations, after expressly agreeing that they have only relied on the terms actually contained in the sales agreements. Accordingly, the Plaintiffs' only hope for introducing parol evidence is to overcome both the integration clause and the disclaimer of reliance. As will be discussed, however, the integration clause and disclaimer will not be disturbed.

Generally, the parol evidence rule bars the admission of any evidence of an oral representation that contradicts a written contract. *Ruff v. Charter Behavioral Health Sys. of N.W. Ind.*, 699 N.E.2d 1171, 1174 (Ind. Ct. App. 1998). An exception to the parol evidence rule exists, however, in the case of fraud in the inducement, where a party was "induced" by fraudulent representations to enter a contract. *Id*. If, however, a party to a contract has expressly

---

[12] Neither party suggests that this apparent typographical error alters the contracts' meaning or enforceability.

disclaimed any reliance on the purported oral representations in an integration clause, it is generally barred from later repudiating that disavowal and alleging fraud. *Circle Centre Dev. Co. v. Y/G Ind. L.P.*, 762 N.E.2d 176, 180-81 (Ind. Ct. App. 2002). In order to invalidate the disclaimer of reliance, therefore, a Plaintiff must show that it had a right to rely on the alleged misrepresentations and in fact relied on them in *executing the disclaimer of reliance*. *Id.* Stated differently, "the fraud must have induced or produced the execution of the . . . disclaimer or contributed to it as a cause." *Id.* "Additionally, it must appear that the misrepresentation was made with the intent that it should be acted on . . . in the execution of the disclaimer." *Id.*

Neither party discusses the closely analogous case of *Urschel Farms, Inc. v. Dekalb Swine Breeders, Inc.*, 858 F.Supp. 831 (N.D. Ind. 1994). In that case, the plaintiff alleged that the defendant provided it with oral representations that the hogs the defendant was selling were free of illness. *Id.* at 832. The parties' sales contracts, however, expressly provided that the plaintiff had not relied on any such representations. *Id.* at 835-38. The court granted summary judgment in favor of the defendant, holding that the plaintiff could not, as a matter of law, establish reliance on the alleged oral statements after expressly disclaiming reliance in the sales contracts. *Id.* at 840-41. The court also sharply criticized the plaintiff's claim that, the integration clause notwithstanding, it still had the right to rely on the alleged oral statements. "Even to a layperson, it would seem a fantastic proposition for an experienced farmer to claim he relied on a *guarantee* that he was purchasing *disease-free* animals." *Id.* at 840. (emphasis in original).

In the present case, just as in *Urschel Farms*, the integration clause and disclaimer prevent the Plaintiffs from now claiming that they relied on the alleged fraudulent

misrepresentations. The Plaintiffs offer no evidence—or even argument—that the alleged fraud induced the execution of the *disclaimer*, and not just the contract itself. *See Circle Centre Dev. Co.*, 762 N.E.2d at 180-81. Rather, they simply claim that "[Defendants] misrepresented that the BHLC inventory at the farm were good dairy replacement heifers." (Pls.' Br. in Opp'n 10.) Absent evidence that they were fraudulently induced to agree to the integration clause and disclaimer, the Plaintiffs will not be permitted to introduce any extrinsic evidence of the alleged misrepresentations. *See Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 589 F.3d 881, 885 (7th Cir. 2009). ("[Disclaimer of reliance clauses] serve a legitimate purpose in closing a loophole in contract law by heading off a suit for fraud used as a device for trying to get around the limitations that the parol evidence rule and contract integration clauses place on efforts to vary a written contract on the basis of oral statements made in the negotiation phase.") (internal quotations omitted).

2. *Summary Judgment on the Fraud Claims Can Not Be Granted.*

Even though the Plaintiffs are unable to introduce extrinsic evidence of their reliance on the alleged misrepresentation, the Defendants are not entitled to summary judgment. A jury could nonetheless find that they committed fraud based purely on the express terms of the sales contract. That is, if the jury concludes that the contract term "Holstein heifer" means a calf that is fit for dairy production, they may conclude that the Defendants committed fraud by delivering useless freemartins. As such, the Plaintiffs do not need to rely on inadmissible parol evidence to prove either the existence of the fraudulent statement or their reliance on it because the alleged misrepresentation is contained on the face of the integrated contract.

The Defendants make a weak argument that the Plaintiffs fraud claim should nonetheless

fail because they cannot prove that they reasonably relied on the alleged misrepresentations. "To demonstrate reasonable reliance, the plaintiff must show not only that he in fact relied on the misrepresentation, but also that he had a right to rely on it." *See McWaters v. Parker*, 995 F.2d 1366, 1372 (7th Cir. 1993). As the Defendants see it, the parties dealt at arms-length and the Plaintiffs simply took a chance and lost. *See Roberts v. Agricredit Acceptance Corp.*, 764 N.E.2d 776, 779 (Ind. Ct. App. 2002) (citing *Plymale v. Upright*, 419 N.E.2d 756, 761 (Ind. Ct. App. 1981)).

Stated simply, the Defendants argue that the Plaintiffs are experienced dairy farmers and that any supposed reliance on statements that the calves were guaranteed to be able to produce milk would not have been reasonable. The Defendants' argument, however, is unpersuasive. Although the reliance on an allegedly fraudulent statement must be reasonable, courts consistently recognize that a party cannot wilfully deceive another, and then escape liability for fraud by, in essence, claiming that they should not have been trusted. "One relying upon a representation is bound to exercise ordinary care and diligence to guard against fraud. However, the requirement of reasonable prudence in business transactions is not extended so as to permit an intentional fraud perpetrated on the unwary." *Carrell v. Ellingwood*, 423 N.E.2d 630, 635 (Ind. Ct. App. 1981). *See also* 14 IND. LAW ENCYCL. Fraud § 24 ("Thus a buyer may rely on express statements of fact by the seller where such statements are not obviously false, and under such circumstances the rule of caveat emptor is inapplicable.") (citations omitted).

Furthermore, gauging the reasonableness of the Plaintiffs' reliance is a highly fact-specific inquiry that does not lend itself to summary judgment. *See Carrell*, 423 N.E.2d 630, 635 (Ind. Ct. App. 1981) ("Deception and reliance involve the state of mind of the victim. As such,

their existence or absence is a question of fact for the trier."). Construing the evidence in the light most favorable to the Plaintiffs, the court cannot say that, as a matter of law, they unreasonably relied on the Defendants' representations. Accordingly, summary judgment cannot be granted and the reasonableness of the Plaintiffs' reliance on the alleged fraudulent statements is a question of fact for the jury.

As a final matter, neither party adequately addresses the fact that BHLC, as a corporation and principal; Steve and Mervin, as agents; and Brigitte, as sole corporate shareholder, are subject to different standards of liability. BHLC's corporate status does not automatically protect it from liability for fraud committed by its employees. Rather, "[i]t is well established that the actions of employees and agents of a corporation are attributable to the corporation, when the actions are done within the scope of employment." *Bud Wolf Chevrolet v. Robertson*, 519 N.E.2d 135, 137 (Ind. 1988). "Thus, a principal is liable for any misrepresentations of his agent undertaken within the scope of the agency, whether or not the principal has knowledge of the fraud." *Mid-Continent Paper Converters, Inc. v. Brady, Ware & Schoenfeld, Inc.*, 715 N.E.2d 906, 909 (Ind. Ct. App. 1999). Furthermore, Steve and Mervin, as agents of BHLC, are of course potentially liable for their own torts. *See Ind. Dept. of Transp. v. McEnery*, 737 N.E.2d 799, 802 (Ind. Ct. App. 2000) (reiterating that an agent who commits a tortious act is equally liable with the principal, and cannot escape liability on the ground that he acted for the principal). As will be more thoroughly explored in the next section, however, Brigitte has no liability on the individual fraud claim against her, but may be held personally liable for BHLC's actions.

In conclusion, the Plaintiffs cannot overcome the sales contracts' integration clause and

disclaimer of reliance to introduce parol evidence to establish their reliance on the allegedly fraudulent misrepresentations. If, however, the jury finds that the contract term "Holstein heifer" contemplated the sale of calves fit for dairy production, the Plaintiffs would not need to introduce extrinsic evidence of the fraud, because it would appear on the face of the contract. Additionally, the Defendants' argument that any reliance by the Plaintiffs on the alleged fraud would not have been reasonable is unpersuasive. Accordingly, summary judgment on the Plaintiffs' two fraud claims cannot be granted in the Defendants' favor and the issue must go to the jury.

**D. Brigitte's Request for Summary Judgment On All Counts.**

Brigitte presents two arguments in favor of granting her summary judgment on Counts II, IV, VI, VIII, and X. She argues that the undisputed material facts show that she had no personal involvement in any of the transactions and cannot therefore be held liable in her individual capacity. Furthermore, Brigitte argues that the Plaintiffs have failed to present evidence to justify piercing the corporate veil of BHLC, to hold her personally liable as its sole shareholder for its alleged wrongdoing.[13] The Plaintiffs apparently concede that Brigitte had no personal involvement in any of the transactions and cannot be individually liable on any of the counts. Construing the record in the light most favorable to the Plaintiffs, however, there is a genuine issue of material fact that precludes summary judgment on the piercing the corporate veil claim.

Ordinarily, corporate officers and shareholders are not personally liable for the debts or acts of a corporation. Ind. Code § 23-1-26-3(b); *Comm'r, Dept. of Envtl. Mgmt. v. RLG, Inc.*, 755

---

[13] To the extent that the Defendants challenge the sufficiency of the piercing the corporate veil accusations in the Plaintiffs' original complaint, yet never filed a motion to dismiss and have thoroughly explored the piercing allegations in discovery, they have apparently allowed the issue to be tried by consent. *See* Fed. R. Civ. P. 15(b)(2).

N.E.2d 556, 559 (Ind. 2001). On the other hand, shareholders and corporate officers are personally liable for misconduct which they have participated in, authorized, or directed. Ind. Code § 23-1-26-3(b); *Comm'r, Dept. of Envtl. Mgmt*, 755 N.E.2d at 559. *See also Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1236 n.7 (Ind. 1994) (holding that corporate officer can be personally liable for inducing the corporation to breach its contract if he is acting outside the scope of his official duties or for personal gain); *Gable v. Curtis*, 673 N.E.2d 805, 809 (Ind. Ct. App. 1996) ("It is well-settled that a corporate officer cannot escape liability for fraud by claiming that he acted on behalf of the corporation when that corporate officer personally participated in the fraud.").

In certain circumstances, however, the doctrine of "piercing the corporate veil" may be invoked to disregard the corporate entity and hold shareholders personally liable for the actions of the corporation. *Comm'r, Dept. of Envtl. Mgmt*, 755 N.E.2d at 563. "The corporate veil is pierced only where it is clear that the corporation is merely a shell for conducting the defendant's own business and where the misuse of the corporate form constitutes a fraud or promotes injustice." *Id.*

As a general rule, Indiana courts are reluctant to disregard corporate identity and do so only to protect third parties from fraud or injustice when transacting business with a corporate entity. *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 504 (Ind. Ct. App. 2007); *Stacey-Rand, Inc. v. J.J. Holman, Inc.*, 527 N.E.2d 726, 728 (Ind. Ct. App. 1988) ("[T]here are cases where, to prevent fraud or injustice, it is necessary to disregard the fiction of distinct corporate existence, and to hold as a matter of equity that such separate legal entity does not exist."). In exercising its equitable powers to pierce a corporate veil, the court undertakes a

highly fact-sensitive inquiry. *Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd.*, 768 N.E.2d 463, 468 (Ind. Ct. App. 2002). "[T]he determination of whether there are sufficient grounds for piercing the corporate veil ordinarily should not be disposed of by summary judgment, in view of the complex economic questions often involved, especially if fraud is alleged." *Cmty. Care Ctrs., Inc. v. Hamilton*, 774 N.E.2d 559, 566 (Ind. Ct. App. 2002) (internal quotations and citations omitted).

"In determining if the party seeking to pierce the corporate veil has met its burden, Indiana courts consider whether the party has presented evidence showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form." *Id*. at 564-65. *See also Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994); *Smith v. McLeod Distrib., Inc.*, 744 N.E.2d 459, 463 (Ind. Ct. App. 2000).

Brigitte argues that she is entitled to summary judgment on all counts regarding her individual liability because the undisputed evidence shows that she had absolutely no involvement in any of the transactions. In their response, the Plaintiffs completely ignore Brigitte's claim that she had no personal involvement in the transactions and apparently concede that she is entitled to summary judgment on her individual liability. *See Caruso*, 197 F.3d at 1197; *Kowalczyk*, 2005 WL 1176599, at *11. Indeed, in their depositions, the Plaintiffs conceded that Brigitte made no representations regarding the calves and that, in fact, they never

spoke with her at all. (L. Keller Dep. 135:2-18; D. Keller Dep. 92:2-15.)

With the undisputed evidence showing that Brigitte did not participate in the transactions—and, in fact, had no contact with the Plaintiffs whatsoever—there are absolutely no grounds to hold her liable on an individual basis on any of the counts against her. *See* Ind. Code § 23-1-26-3(b); Accordingly, Brigitte is entitled to summary judgment on all counts regarding her individual liability.

The Plaintiffs do, however, offer evidence in support of piercing BHLC's corporate veil. For example, they allege that the corporate form was misused when BHLC was incorporated with Brigitte as its sole shareholder after Steve dissolved a previous corporation, Central States Livestock Sales, Inc., to avoid the collection of a judgment against him for civil fraud. (Statement of Genuine Issues ¶ 13; B. Holmes Dep. 39:13-22.) Furthermore, Steve testified during his deposition that because he would be unable to receive credit, Brigitte personally borrowed the money needed to form the business and incorporated BHLC under her own name. (S. Holmes Dep. 59:10-20.) Finally, the Plaintiffs argue that Brigitte had no experience in livestock sales and BHLC was more or less operated directly by Steve and Mervin, who made all decisions regarding ordering inventory, caring for the livestock, and setting prices. (Statement of Genuine Issues ¶¶ 15, 20; B. Holmes Dep. 95:11-96:21.)

Even more persuasively, the Plaintiffs present evidence to suggest payment of Brigitte's individual obligations by BHLC and commingling of their assets. The Plaintiffs argue that BHLC was paying personal expenses such as auto insurance, life insurance, health insurance, personal car payments, personal loans, and contributions to an IRA. (Statement of Genuine Issues ¶ 24.) For example, Brigitte testified during her deposition that BHLC paid for a personal

life insurance policy for her and Steve. (B. Holmes Dep. 206:14-25.)  Brigitte testified that she purchased a new truck in 2006, and that although it was paid for with BHLC funds, it was titled in her own name. (B. Holmes Dep. 213:2-215:17.)  Brigitte was also questioned by the Plaintiff about numerous other personal expenses, such as real property insurance and investment account contributions, ostensibly drawn on the BHLC account. (B. Holmes Dep. 209:8-211:19.)  Finally, the Plaintiffs presented evidence that Brigitte used the BHLC corporate account for loans to friends, as well as her daughter, and for providing gifts to friends and a member of their church. (B. Holmes Dep. 221:21-224:25.)

Viewing this evidence in the light most favorable to the Plaintiffs, the Court cannot say that, *as a matter of law*, and particularly where the inquiry is highly fact-sensitive, *Cmty. Care Ctrs., Inc.*, 774 N.E.2d at 566, that Brigitte is shielded from liability because BHLC's corporate veil cannot be pierced.  Accordingly, Brigitte is not entitled to a grant of summary judgment on the piercing the corporate veil claim.  Should the jury hold BHLC liable on any of the counts, it must then consider whether to pierce BHLC's corporate veil and hold Brigitte personally liable.

## V. CONCLUSION

To summarize, the Defendants' Motion for Partial Summary Judgment (Docket # 60) is GRANTED IN PART and DENIED IN PART.  Count VI (violations of the Packers and Stockyards Act) against BHLC, Steve, and Mervin was not part of this motion and remain for trial.  Steve and Mervin are entitled to summary judgment on Counts II (breach of contract) and IV (breach of warranty), while Counts VIII (actual fraud) and X (constructive fraud) against them remain for trial.  Counts II (breach of contract), VIII (actual fraud), and X (constructive fraud) against BHLC remain for trial, as does Count IV (breach of warranty), but only with

26

respect to the seven calves for which BHLC received notice of the alleged breach of warranty.

Brigitte is granted summary judgment on all counts for the claims being made against her in her individual capacity, but if the jury finds BHLC liable on any of the counts against it, they must also consider whether to pierce BHLC's corporate veil and hold Brigitte personally liable. **This matter is set for a telephonic scheduling conference on July 16, 2010, at 10:00 a.m. The Court will initiate the call to counsel.**

SO ORDERED.

Enter for June 25, 2010.

 S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge