# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| LDT KELLER FARMS, LLC, and<br>KELLER FARMS PARTNERSHIP, )<br> )<br> )<br>   Plaintiffs / Counterclaim Defendants, )<br> )<br>v. )<br> )<br>BRIGITTE HOLMES LIVESTOCK CO., INC., )<br>BRIGITTE HOLMES, )<br>and MERVIN MISHLER )<br> )<br>   Defendants / Counterclaim Plaintiffs. ) | CAUSE NO.  1:08-CV-243 |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION[1]

LDT Keller Farms, LLC and the Keller Farms Partnership (collectively, "Keller Farms)

operate a dairy farm near Fort Recovery, Ohio.  Luke Keller ("Luke"), Daniel Keller ("Dan"),

and Timothy Keller ("Tim") are the sole members of LDT Keller Farms, LLC and each have an

equal share in the Keller Farms Partnership.[2]

The Brigitte Holmes Livestock Company ("BHLC") is an Indiana corporation and

registered commercial dealer of livestock.  Brigitte Holmes ("Brigitte") is the sole shareholder,

director, and President of BHLC.  Samuel Steven Holmes ("Steve"), Brigitte's then, but now

---

[1] The Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1332, and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.  The parties agree that Indiana law governs the case.

[2] Because Tim Keller had relatively little involvement in these transactions, "the Kellers" refers primarily to Luke and Dan.  Luke is the father of both Dan and Tim and generally considered the CEO of the dairy enterprise.

former, husband, and Mervin Mishler ("Merv") were employed by BHLC as sales agents.[3]

On October 17, 2008, Keller Farms filed suit against BHLC, Steve, Merv, and Brigitte, alleging a breach of contract (Count II), breach of the implied warranty of fitness for a particular purpose (Count IV), violation of the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 213 (Count VI), actual fraud and fraudulent concealment (Count VIII), and constructive fraud (Count X). Their claims arose out of ten separate purchases of "Holstein heifer" calves by Keller Farms from BHLC from October 26, 2006, to January 31, 2007, totaling 204 head. Keller Farms alleges that the calves were represented to be "replacement Holstein heifers," and therefore likely to eventually give milk, but that 197 of them were actually sterile and therefore useless to a dairy. When Keller Farms placed newspaper ads in a regional trade publication seeking other farmers who also bought sterile calves from BHLC, the Defendants and Steve counterclaimed for defamation. (*See* Docket # 44.)

After ruling on various summary judgment motions, the following claims of Keller Farms remained for a bench trial: Count II (breach of contract) against BHLC; Count IV (breach of warranty) against BHLC, but only with respect to 7 calves sold on January 31, 2007; Count VI (alleging violations of the PSA) against BHLC, Steve, and Merv; Count VIII (actual fraud) against BHLC, Steve, and Merv; and Count X (constructive fraud) against BHLC, Steve, and Merv. Brigitte was granted summary judgment on all counts, but as the sole shareholder of BHLC, she remained potentially liable for its actions under a "piercing the corporate veil" theory. Part of the defamation counterclaims also remained for trial. (*See* Docket ## 69, 70.)

Just prior to the bench trial, however, Keller Farms settled with Steve, concerning their

---

[3] Because the defendants are subject to varying standards of liability, the Court will generally address each defendant separately. For simplicity, however, "the Defendants" means BHLC, Mervin, and Brigitte.

claims and his counterclaims, with no exchange of money, and those claims and counterclaims were dismissed with prejudice on February 22, 2011. (Docket # 107.)

The balance of the case then proceeded to a three-day bench trial on March 1, 2011. The remaining Defendants, however, moved to dismiss their defamation counterclaims during the trial, and there being no objection, they were dismissed with prejudice under Federal Rules of Civil Procedure 41(a)(2) and (c).

At the close of Keller Farm's case in chief and again at the close of all of the evidence, the Defendants orally moved in accordance with Federal Rule of Civil Procedure 52(c) for a judgment on partial findings concerning all claims (except for the breach of warranty claim concerning 7 calves sold on January 31, 2007). The Court granted the motion with respect to the PSA claim, holding that Keller Farms failed to present any evidence that the Defendants' actions had an adverse effect on competition, as is almost universally required for such claims. *See Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 362 (5th Cir. 2009) (collecting cases and holding that "an anti-competitive effect is necessary for an actionable claim under the PSA in light of the Act's history in Congress and its consistent interpretation by the other circuits."); *Farrow v. U.S. Dept. of Agr.*, 760 F.2d 211, 214 (8th Cir. 1985) ("A practice is 'unfair' under § 213(a) if it injures or is likely to injure competition."); *Pac. Trading Co. v. Wilson & Co.*, 547 F.2d 367 (7th Cir. 1976); *cf. Spencer Livestock Com'n Co. v. Department of Agriculture*, 841 F.2d 1451, 1455 (9th Cir. 1988).

Any claim for attorney fees was also removed from the case as a matter of law. *See In re Busick*, 264 B.R. 518, 524 (Bankr. S.D. Ind. 2001) (noting that attorney fees are not available for common law fraud claims); *Ind. Glass Co. v. Ind. Mich. Power Co.*, 692 N.E.2d 886, 889 (Ind.

Ct. App. 1998) (explaining that attorney fees are not incidental and consequential damages under Indiana's UCC).[4]  The Court then took the remainder of the motions under advisement.

After examining the entire record, considering the arguments of counsel, and determining the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a) based upon a preponderance of the evidence.

## II. FINDINGS OF FACT[5]

For centuries, it has been known that a female calf born twin to a bull will be sterile and unable to breed. (Defs.' Ex. J.)  Because such bovine animals—commonly known in the dairy industry as "freemartins"—do not have a complete reproductive tract, they cannot reproduce and give milk. (*Id.*)  Thus, freemartin heifers are useless as dairy cows and are generally consigned to immediate slaughter. (*Id.*)[6]

This case concerns the sale of 197 freemartins to Keller Farms, between October 26, 2006, and January 31, 2007.  In 2006, the Kellers decided to dramatically bolster the size of their dairy herd from 300 to 800 cows for increased milk production.  Because it would take too long

---

[4] Keller Farms did not offer any statutory authority other than the PSA to support their attorney fee claim and there was no attorney fee provision in any of the written contracts.

[5] Any Finding of Fact deemed to be a Conclusion of Law is hereby incorporated into Section III and any Conclusion of Law in Section III deemed to be a Finding of Fact is hereby incorporated into this Section.

[6] There is a genetic reason for this relatively infrequent phenomenon, and thus genetic tests can determine if a heifer is in fact a freemartin.  Because such tests cost approximately $50 per animal, simple physical examinations, which are 90-95% accurate, are commonly performed.  One type of physical examination, known as "tubing," involves inserting a probe into the reproductive tract of the heifer.  If the probe only penetrates a few inches, the heifer is probably a freemartin.  Tubing must generally be done within ten days or so of the calf's birth, although a palpation test by a veterinarian is available after the calf has grown to sexual maturity—around 600 pounds or 11 months of age.  Accordingly, there is a window of time, between 2 weeks and 11 months, in which it is not possible to physically examine the calf to determine if it is a freemartin and thus the farmer, if he chooses, must resort to genetic testing.

to increase the herd by simply breeding existing stock, the Kellers sought to purchase Holstein calves in the marketplace. Generally, the Kellers were interested in baby calves, sometimes called "bucket calves," of generally less than 110 pounds. After learning that BHLC might have suitable calves for sale, Luke called the company and spoke to Steve, its principal sales agent. Luke informed Steve that Keller Farms was looking to build up its dairy herd and inquired if BHLC had "replacement Holstein heifers" for sale. In the dairy industry, a "replacement heifer" is commonly understood to mean a calf that will likely be able to give milk. When Steve confirmed that BHLC had such calves, the Kellers arranged a visit.

BHLC was incorporated on March 14, 2005, and so by the time the Kellers called, BHLC had been in operation for about a year and a half. It was Steve's idea to sell cattle under the name Brigitte Holmes Livestock Company and the reason for such a trade name was simple: Steve has a checkered past in the livestock industry, including a large existing civil judgment stemming (or so he told Brigitte) from check-kiting.[7] In any event, Steve was unable to secure any credit to finance the livestock transactions or to obtain the livestock dealer bond under 7 U.S.C. § 204. As a consequence, Steve convinced Brigitte, his wife, to form a corporation naming herself as the sole shareholder and director. Although Brigitte had no prior experience in buying or selling livestock, and little practical experience with dairy cattle, she hoped to eventually learn the business from Steve. In actual practice, however, Steve ran every phase of BHLC, with Brigitte largely relegated by Steve to a book-keeping role.[8]

---

[7] The actual judgment was entered in the Circuit Court for Macon County, Tennessee, on October 2, 1985, and awarded the Plaintiffs, Macon County Livestock, Inc. and Jimmy Doss, $523, 640.63 in damages for Steve's "fraudulent check floating scheme, breach of his fiduciary duty, and conversion . . . ." (Defs.' Ex. K.)

[8] After traveling from Kentucky without the benefit of subpoena and waiting in the witness room for two days, Steve eventually testified at trial as a witness for Keller Farms. Such uncompensated inconveniences suggest an unusual level of motivation and it soon became apparent that Steve was here, not to tell "the truth" as he

Despite this limited role, Brigitte nevertheless kept accurate financial records for BHLC and observed corporate formalities. (Defs.' Ex. E.)  BHLC was incorporated by an attorney as a Subchapter S corporation and was, at the time of the sales to the Kellers, in good standing with the Indiana Secretary of State. (*Id*.)  BHLC held itself out as a corporation in its business dealings, was adequately capitalized, and had adequate cash-flow.  BHLC was also properly registered with the United States Department of Agriculture, *see* 7 U.S.C § 203, and secured the statutorily-required bond. *See* 7 U.S.C § 204. (Pls.' Ex. 2.)  Although Brigitte did pay some personal expenses from the BHLC corporate account, these were disclosed on BHLC's informational income tax returns, were primarily done for convenience, and not in disregard of the corporate form.

BHLC also employed Merv as a sales agent and paid him on a commission basis for any livestock sales.  Merv, however, had virtually no authority in the operation of the business, would perform a mere clerical role in any sales, and took directions from Steve.

Steve was the one who regularly ordered BHLC's cattle, primarily from Glenview Livestock Company, and by 2006, he was frequently purchasing freemartins.  The Glenview Bills of Lading show that Steve was usually the person who received the shipped cattle. (Pls.' Exs. 14, 15, 16.)  Glenview would conspicuously designate the freemartins by applying pink livestock marker to the white areas of the calf, such that they appeared almost entirely black and pink.  Accordingly, the calves were known to be, and were readily identifiable as, freemartins by both Glenview and Steve.  Steve, however, told both Brigitte and Merv that the pink coloration

maintained, but to settle old scores.  Indeed, Steve's demeanor clearly revealed that he remains embittered about his divorce settlement with Brigitte and thus his testimony, riddled as it was with bias and prejudice, has been almost entirely rejected.

meant that these calves should be separated from bulls and other livestock, and did not reveal to them that they were actually freemartins. The pink coloration would last, depending on the calves' exposure to the weather, for at least several days, and often for weeks. Because there is no market for freemartins, except for slaughter, Steve was able to purchase them for approximately $50 per head from Glenview.

Steve would not test the calves, or allow them to be tested, to verify if they were truly freemartins. Nevertheless, because he specifically ordered them from Glenview, Steve well-knew them to be freemartins, and thus knew that they were not suitable for a dairy operation. Similarly, at some point, Merv eventually deduced that because of the low purchase price of the animals that a high percentage of them were freemartins. Nevertheless, because BHLC purchased the freemartins so cheaply, it was able to offer them for sale well-below the market price for calves suitable for dairy production.

Although BHLC would occasionally sell high-quality livestock guaranteed to breed (Defs.' Ex. B), at some point, but prior to the sale of any animals to the Kellers, Brigitte overheard Steve telling prospective buyers that if they did not want to pay for top-quality calves, BHLC had some cheaper calves (he termed them "iffys"), whose breedability was questionable. Concerned, Brigitte suggested they add "Breedability not guaranteed" to every sales contract involving such calves, and thus emphasize to the buyer the standard contract provision that such sales were "as-is, where-is." Thereafter, Steve had Merv, in his clerical role, write that phrase prominently on all such sales contracts.

On October 27, 2006, Luke and Dan Keller arrived at the BHLC farm to view the calves for sale. While at BHLC, the Kellers dealt almost exclusively with Steve, and, in fact, never had

any contact with Brigitte.  Although Merv was present during the transaction, they had no

substantive interaction with him.[9]  The Kellers reiterated to Steve that they were looking to

expand their dairy herd and wished to purchase replacement Holstein heifers.  Steve directed

them to a pen containing fairly large calves, each about 250 to 300 pounds, for selection.  None

of the calves had ear tags, so their prior history was unknown.[10]  Calves of this size are too big to

tube and too small for a palpation test, but because the price was tempting to the budget-

conscious Kellers, they quickly chose 35 calves from the pen (30 at $450; 5 at $425 per head)

and paid the bargain price of $15,625.00.[11]

The calves were described on BHLC's standard sales contract as "Holstein Heifers," to

which Merv added the hand-written notation "Breedability Not Guaranteed."  In the dairy

industry, the term "Holstein heifer" means a female calf, of the breed Holstein, that has not

reproduced.  The industry also refers to freemartins as a class or type of heifer. (Defs.' Ex. J.)  A

"dairy replacement heifer," on the other hand, means a heifer calf that is biologically capable of

reproduction, and thus likely to give milk in the future.  Therefore, the term "Holstein heifer" as

used in the BHLC contracts simply means that none of the calves had reproduced, but the term

_____

[9] Dan Keller remembers Steve doing most of the talking and this seems to be consistent with the Keller's memory of events until they dismissed their claims against Steve.  In fact, Dan could not remember Merv making any specific statements about the cattle.  Luke's testimony that he talked to Merv and that Merv represented the calves as suitable dairy replacement heifers is more likely motivated by a recent and necessary desire to pin liability on Merv than any true recollection of these events.  Having observed both Steve and Merv on the stand and their demeanor, it is far more likely that Steve was the only one who made representations concerning the calves.

[10] According to the testimony of Matthew Irwin, the Glenview calves normally had ear-tags when they were delivered to BHLC and thus, presumably, some traceable history.  At some point, however, Steve would have the ear-tags removed.  Nevertheless, even if tagged, it is unlikely that the parentage and genetics of the calves could ever be confirmed.  Overall, however, the Kellers were largely indifferent about the genetics of the calves because they believed their feeding program would overcome almost any genetic short-comings.

[11] The fair market price at auction for Holstein dairy replacement heifers was, at the time, around $500 per head.

also offers no assurance that they ever would reproduce, and therefore does not exclude freemartins.

The sales contract also states that:

> All livestock and goods are sold "AS IS" and "WITH ALL FAULTS"; Seller makes no guaranty, warranty, or representation, expressed [sic] or implied (including any regarding the merchantability or fitness for a particular purpose), as [to] the kind, size, weight, quality, character, health, description or condition, or pregnancy of any of the livestock or goods. Purchaser has not replied [sic] upon or been induced by any statements or representations of any person regarding the livestock or goods other than those statements and representations expressly set forth in writing hereon. Purchaser has been afforded the opportunity for full and complete investigations, examination and inspection of the livestock and goods.

The Kellers apparently never questioned the contract's disclaimer of reliance nor does it seem to have ever been a topic of discussion.

At the second transaction, the Kellers requested to tube the baby calves, all of whom were much smaller than those in the first sale. Merv, apparently acting at Steve's direction, told them that because BHLC was selling the calves "as-is," they could not be tubed. This refusal by BHLC to allow the prospective buyer, Keller Farms, to conduct a simple inspection of the goods (even apart from their abnormal appearance—the pink coloration—and the bargain basement price) should have been enough to elicit questions, suspicion, and doubt. Indeed, a prudent purchaser would have walked away, but incredibly (perhaps the $200 per head price was too tempting) the Kellers forged ahead and bought those calves and, over the intervening months, many more.

After the second sale, and all subsequent sales, when Luke and Dan returned to the farm with the animals, Tim would allegedly tube them and ostensibly confirm that they were not

freemartins.[12]  Believing that the calves would eventually be able to reproduce and give milk, the Kellers began to raise them so they could join the dairy herd.[13]

All subsequent transactions, except the last, followed the same pattern: the Kellers dealt primarily with Steve and never with Brigitte; Merv made no representations about the calves, other than to write on the contract "Breedability not guaranteed"; the same form contract was used on each occasion; and each sale was for "Holstein heifers."  And, as previously noted, Keller Farms never tubed the calves before purchasing them and apparently did not do so (or did so incorrectly) afterward.  Specifically, the transactions were as follows:

- November 10, 2006 - 33 calves purchased at $200 per head, for a total of $6,600

- November 25, 2006 - 30 calves purchased at $400 per head and 11 calves bought at $200 per head, for a total of $15,700

- December 8, 2006 - 7 calves purchased at $200 per head, for a total of $1400

- December 15, 2006 - 17 calves purchased at $200 per head, for a total of $3400

- December 21, 2006 - 11 calves purchased at $200 per head, for a total of $2200

- January 11, 2007 - 11 calves purchased at $200 per head, for a total of $2200

- January 18, 2007 - 15 calves purchased at $300 per head and 5 calves bought at $200 per head, for a total of $5500

_____

[12] One of the great mysteries in this case is how Tim could allegedly tube so many calves and never discover that they were freemartins, at least until the last 7 were delivered on January 31, 2007.  The possible explanations boil down to: (1) he tubed the previous calves but did so incorrectly; (2) he did not tube them, but told Luke and Dan he did and that the calves were not freemartins; (3) he tubed them, found them to be freemartins, and told Luke and Dan who chose to continue buying heifers from BHLC.  Although Keller Farms speculatively suggests that the previous calves had been, as is euphemistically termed in the trade, "raped" to hide their freemartin status, there is no evidence to support this claim.  Consequently, the Court is left with the two most logical inferences, that Tim either incorrectly tubed the calves, or neglected to do so.

[13] Because the Kellers use an ear-tag tracking system for each calf (Pls.' Ex. 4), they have identified and monitored the calves purchased from BHLC.

On January 31, 2007, the Kellers purchased another 15 calves at $200 per head from BHLC. The Kellers then inquired if BHLC had any additional calves for sale and were told that although no more were on hand, more might be available later that day. The Kellers then ordered these additional calves sight-unseen and relied on BHLC to bring calves that could join a dairy herd. Steve then instructed or authorized Merv to purchase 7 calves from the Shipshewana, Indiana livestock auction and to deliver them to Keller Farms. Merv purchased 7 small Holstein veal calves[14] at the auction for between $27 and $52.50 per head, for a total of $280.25.

Later that evening, Merv delivered the 7 calves to Keller Farms and was paid $200 per head, plus a $100 delivery fee. Unlike the other small calves sold by BHLC to Keller Farms, these calves did not have the suspicious pink markings. Tim gave the calves some long-lasting penicillin, but after actually tubing them the next day, this time in the presence of Luke, he discovered they were freemartins.

Luke then called Steve to inform him that the 7 calves were freemartins and asked what BHLC intended to do. Steve responded that because the breedability of the calves had not been guaranteed, BHLC would do nothing. Following this conversation, the Kellers had no further contact with BHLC, Steve, or Merv until they filed this lawsuit on October 17, 2008.

The incident concerning the 7 calves finally raised a "red flag" and caused the Kellers to suspect that the other calves they had purchased from BHLC might also be freemartins. They

---

[14] Merv testified that he believed the auction company termed them "veal calves" because they were bucket calves and had always been fed milk.

did not, however, order verifying blood tests.[15]

Knowing that the 7 calves would likely be useless for their intended purpose, the Kellers decided to sell them for slaughter. Because the calves were immunized prior to tubing, however, the Kellers chose to wait for the penicillin to wear-off (about 30 days) before consigning them to slaughter. Instead of promptly re-selling the 7 calves, however, or genetically testing the others, Keller Farms kept *all* of the calves for many months until they were of a size that a veterinarian could examine them by palpation. In the meantime, Keller Farms incurred expenses of approximately $2.48 per day to raise each calf.[16] After each calf was tested and found to be a freemartin, it was later sold at auction for slaughter.

### III. CONCLUSIONS OF LAW

**A. The Breach of Contract and Breach of Warranty Claims Against BHLC**

*1. Indiana's Version of the Uniform Commercial Code Governs Both Claims*

Because the calves are "goods," Keller Farms' breach of contract and breach of implied warranty claims are governed by Article 2 of Indiana's version of the Uniform Commercial Code.[17] *See* Ind. Code § 26-1-2-105(1) (defining "goods" as "all things . . . which are movable at the time of identification to the contract for sale . . ."); *Urschel Farms, Inc. v. Dekalb Swine*

---

[15] Although the Kellers claim they did not know such a blood test was available, the Court rejects this testimony as highly unlikely given their combined lengthy experience, ready and frequent interaction with veterinarians, and obvious dairy business sophistication.

[16] Keller Farms' records show it incurred $58,622.73 in total expenses for feed, labor, utilities, supplies, facilities, equipment, insurance, bedding, and fuel, to raise the 197 calves during Phase 1. (Pls.' Ex. 23.) (The growth of the calves is tracked in phases, with Phase 1 consisting of the first 120 days). Dividing the total expenses of Phase 1 ($58,622.73) by the total number of days in Phase 1 (120), yields $488.52 per day as the amount to maintain the 197 calves. Dividing $488.52 by 197 gives a cost of $2.48 per calf, per day.

[17] For ease of reading, all in-text references to Indiana's version of the Uniform Commercial Code, Ind. Code § 26-1-2-101, *et seq.*, will be shown as "§ 2-___". Any reference to "the UCC" means the Uniform Commercial Code in general.

12

*Breeders, Inc.*, 858 F. Supp. 831, 833 (N.D. Ind. 1994) (treating hogs as goods); *Midwest Hatchery & Poultry Farms, Inc. v. Doorenbos Poultry, Inc.*, 783 N.W.2d 56, 61 (Iowa Ct. App. 2010) (reiterating that the UCC includes livestock as "goods").

The UCC conditions the buyer's ability to assert a claim against the seller—and, of course, to recover damages—on how the parties have treated the goods once a dispute arises. As a threshold matter, and especially since the issue was largely ignored at trial, the Court will first address whether Keller Farms accepted, rejected, or, perhaps, later revoked acceptance of the calves.

If the goods fail to conform to the contract in any way, the buyer may reject them in whole or in part. Ind. Code § 26-1-2-601. Any rejection must be made within a "reasonable time after . . . delivery or tender" and "is ineffective unless the buyer seasonably notifies the seller." Ind. Code § 26-1-2-602(1). "To qualify as a rejection under [§ 2-602,] the buyer's rejection must be clear and unambiguous. To be effective, the notice must make it clear that the rejection is final, allowing the seller to act and dispose of the goods without further dealings with the buyer." *McClure Oil Corp. v. Murray Equipment, Inc.*, 515 N.E.2d 546, 551-52 (Ind. Ct. App. 1987) (internal citation and quotation omitted). *See also CMI Corp. v. Leemar Steel Co.*, 733 F.2d 1410, 1414-15 (10th Cir. 1984) (finding no rejection under Oklahoma UCC where buyer only informed seller it had a "problem" with the goods, but did not clearly and unambiguously reject them).

Acceptance, on the other hand, can occur in one of two ways. If the buyer fails to make an effective rejection under § 2-602(1), the goods are deemed accepted, although "such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them." Ind.

Code § 26-1-2-606(1)(b). Alternatively, acceptance can occur if the buyer, "after a reasonable opportunity to inspect the goods[,] signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity." Ind. Code § 26-1-2-606(1)(a).

Once the goods have been accepted by the buyer, they cannot later be rejected. Ind. Code § 26-1-2-607(2). In certain circumstances, however, a buyer may revoke acceptance. Under § 2-608:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
>
>> (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
>>
>> (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

As with rejection, revocation of acceptance requires the buyer to affirmatively give notice to the seller. Ind. Code § 26-1-2-608(2). *See also DeVoe Chevrolet-Cadillac, Inc. v. Cartwright*, 526 N.E.2d 1237, 1240 (Ind. Ct. App. 1988) (stating that notice of revocation should be in writing and that "[m]erely complaining about the quality of goods, without more, does not adequately inform the seller the buyer has revoked.").

Once the goods are accepted, the buyer's remedies are dictated by § 2-714:

> (1) Where the buyer has accepted goods and given notification [under § 2-607(3)], he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

14

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under [§ 2-715] may also be recovered.

Before the buyer can recover, however, it must give the seller notice of the alleged non-conformity or breach, or else it is barred from *any* remedy. Ind. Code §§ 26-1-2-607(3)(a), 2-714(1). Notice is a condition precedent to recovery and as such, the buyer's failure to provide timely notice waives its right to assert any breach. *Lemon v. Anonymous Physician*, No. 1:04-cv-2083, 2005 WL 2218359, at *2 (S.D. Ind. Sept. 12, 2005) (dismissing claims under Rule 12(b)(6) because no notice was given). *See also McClure Oil Corp.*, 515 N.E.2d at 554; *Courtesy Enterprises, Inc. v. Richards Laboratories, Inc.,* 457 N.E.2d 572, 576 (Ind. Ct. App. 1983). *Cf. Collins v. Pfizer, Inc.*, No. 1:08-cv-888, 2009 WL 126913, at *2-3 (S.D. Ind. Jan. 20, 2009) (reiterating that notice is a condition precedent to recovery under § 2-607, but suggesting that the complaint could serve as notice in personal injury cases).[18]

The buyer must give notice in all cases in which it has accepted a tender of non-conforming goods, and such non-conformity "includes not only breaches of warranties but

---

[18] Other courts that have interpreted UCC § 2-607 have consistently held that notice is a condition precedent to recovery and that failure to give notice waives *any* remedy. *See Standard Alliance Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir. 1978) (noting that under Ohio UCC, notice under § 2-607 is a condition precedent to any recovery and the burden of proof is on the plaintiff to show that notice was given within a reasonable time); *Whitwell v. Wal-Mart Stores, Inc*., No. 09-513, 2009 WL 4894575, at *4-5 (S.D. Ill. Dec. 11, 2009) (dismissing breach of contract claim under Illinois UCC because buyer failed to give notice under § 2-607); *Peavey Electronics Corp. v. Baan U.S.A., Inc*., 10 So.3d 945, 960 (Miss. Ct. App. 2009) (upholding dismissal of breach of contract and breach of warranty claims because buyer failed to give notice under Mississippi UCC § 2-607(3); *Gen. Matters, Inc. v. Paramount Canning Co.*, 382 So.2d 1262, 1264 (Fla. Dist. Ct. App. 1980) (under the Florida UCC, "the burden is on the plaintiff to show that he gave the required notice within a reasonable time").

also any failure of the seller to perform according to his obligations under the contract." Ind. Code § 26-1-2-714 cmt. 2. "The language of [UCC § 2-607(3)(a)] refers to 'any breach' without differentiating warranty and contract claims." *Whitwell*, 2009 WL 4894575, at *4-5 (quoting *Greenwich Indus., L.P. v. Leggett & Platt, Inc.*, No. 07 C 6550, 2009 WL 1657441, at *4 n.2 (N.D. Ill. June 11, 2009)).

The notice requirement balances several important policy concerns. "The first, and most important, of these is that notice must be given so as to enable the seller to settle the issue through negotiation or other non-litigious means." *Courtesy Enterprises, Inc. v. Richards Laboratories, Inc.,* 457 N.E.2d 572, 576-77 (Ind. Ct. App. 1983) (citing JAMES J. WHITE & ROBERT S. SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE 421 (1980); UCC § 2-607 cmt. 4). Notice must also be given to allow the seller to prepare for negotiation and litigation. *Id.* (citing WHITE & SUMMERS at 422). "What runs throughout all these considerations is the seller's right to rely upon the finality of a transaction after the elapse of a particular period of time." *Id.*

### 2. *Keller Farms Accepted All of the Calves*

The first step in considering Keller Farms' breach of contract and breach of warranty claims, therefore, is to determine whether Keller Farms rejected or accepted the calves or, alternatively, accepted them but later revoked acceptance.

After the calves were brought back to its farm, Keller Farms had a reasonable opportunity to inspect them, *see* Note 12, *supra*; § 2-606(1)(b), and, accordingly, Keller Farms effectively accepted them. Stated another way, Keller Farms took no action to affirmatively reject the calves and never informed BHLC of any non-conformities. *See* Ind. Code § 26-1-2-602 cmt. 1

(reiterating that the buyer must take affirmative action to avoid acceptance); *McClure Oil Corp.*, 515 N.E.2d at 551-52. Indeed, the Kellers promptly returned to BHLC for more calves, signifying acceptance of their previous purchases. At that point, in the absence of an affirmative rejection and after an opportunity to inspect the calves (and certainly after purchasing still more), Keller Farms is deemed to have accepted the calves. *See* Ind. Code § 26-1-2-606(1)(b) (stating that goods are accepted in the absence of a rightful rejection as long as buyer has had a reasonable opportunity to inspect them); Ind. Code § 26-1-2-606(1)(a) (stating that acceptance also occurs if, after reasonable opportunity for inspection buyer signifies to seller that goods are conforming); *McClure Oil Corp.*, 515 N.E.2d at 552 ("Since [the buyer] did not reject the goods, it is axiomatic that it accepted them.").

This pattern continued with each successive transaction, up to the last 7 calves purchased on January 31, 2007. Once those last 7 calves were actually inspected, Keller Farms found them to be freemartins. Knowing that the calves were useless for dairy production, Luke contacted Steve and asked what BHLC intended to do about the 7. When Steve responded that BHLC intended to do nothing because the calves were not guaranteed to breed, Keller Farms could have rejected them, but did not. Indeed, although Luke reported a problem with the calves, he never affirmatively refused to accept the goods. *See CMI Corp.*, 733 F.2d at 1414-15. Thereafter, Keller Farms had no more contact with BHLC until filing suit some eighteen months later. In the absence of an effective rejection, therefore, Keller Farms also accepted the 7 calves. *See* Ind. Code § 26-1-2-606(1)(b).

Suspicious at last, Keller Farms could have immediately ordered genetic testing for the remaining calves but they apparently did not want to incur that relatively modest expense.

Nevertheless, after all the remaining calves were examined by a veterinarian some months later and confirmed as freemartins, Keller Farms was arguably presented (although they do not argue it) with yet another opportunity to revoke acceptance, given the possible difficulty concerning any prior discovery of "non-conformity." *See* Ind. Code § 26-1-2-608(1)(b)). Keller Farms, however, made no effort to revoke, and, consequently, all of the calves remained accepted. *See* Ind. Code § 26-1-2-608(2); *DeVoe Chevrolet-Cadillac, Inc.*, 526 N.E.2d at 1240.

*3. The Breach of Implied Warranty Claim with Respect to the January 31, 2007, Calves*

Because the calves were accepted, Keller Farms is able to advance a breach of implied warranty of fitness claim under § 2-315 against BHLC. The Court previously determined, however, that Keller Farms only gave notice with respect to the 7 calves purchased on January 31, 2007, and thus, the warranty claim is barred with respect to all but these calves. (See Docket # 69.) In order to prevail concerning the 7 calves, Keller Farms must show that: (1) BHLC had reason to know of Keller Farms' particular purpose in purchasing the 7 calves; (2) BHLC had reason to know that Keller Farms was relying on its judgment to buy the right kind of calves; and (3) Keller Farms in fact relied on BHLC's skill or judgment. *See* Ind. Code § 26-1-2-315.

Notably, during final argument, counsel for BHLC conceded liability on the breach of warranty claim, and only challenged the amount of damages Keller Farms could recover for the 7 calves.

"The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Ind. Code § 26-1-2-714(1); *see Cimino v. Fleetwood Enterprises, Inc.*, 542 F. Supp. 2d

869, 886-87 (N.D. Ind. 2008). While this method is "the usual, standard and reasonable method of ascertaining damages in the case of breach of warranty[,] . . . it is not intended as an exclusive measure." Ind. Code § 26-1-2-714 cmt. 3. Alternative methods articulated by Indiana courts to calculate damages are "(1) the cost to repair, (2) the fair market value of the goods as warranted less the salvage value of the goods, or (3) the fair market value of the goods as warranted at the time of acceptance less the fair market value of the goods as received at the time of acceptance." *Schroeder v. Barth, Inc*., 969 F.2d 421, 424 (7th Cir. 1992) (citing *Michiana Mack, Inc. v. Allendale Rural Fire Protection District*, 428 N.E.2d 1367, 1370-71 (Ind. Ct. App. 1981)); *see also Cimino*, 542 F. Supp. 2d at 886-87.

"In general, no particular degree of mathematical certainty is required in awarding damages so long as the amount awarded is supported by evidence in the record." *Iron Dynamics v. Alstom Power, Inc*., No. 1:06-cv-357, 2008 WL 2078621, at *5 (N.D. Ind. May 15, 2008) (quoting *Whiteco Properties, Inc. v. Thielbar*, 467 N.E.2d 433, 438 (Ind. Ct. App. 1984)); *see also Bob Anderson Pontiac, Inc. v. Davidson*, 293 N.E.2d 232, 404 (Ind. Ct. App. 1973). "However, an award may not be based upon mere conjecture, speculation, or guesswork." *Whiteco Properties*, 467 N.E.2d at 438. The plaintiff bears the burden to prove the amount of its damages. *Shroeder*, 969 F.2d at 424.

Recapture of the purchase price, however, is generally not an available remedy for accepted goods under § 2-714(2). *Schroeder*, 969 F.2d at 424. Rather, it is appropriate only when the buyer has rejected the goods or revoked acceptance, *Id*. (citing *Michiana Mack*, 428 N.E.2d at 1372); *see also* Ind. Code § 26-1-2-711, or, alternatively, in the few cases where the goods are accepted but have no scrap value. *Cimino*, 542 F. Supp. 2d at 87 (citing *Michiana*

*Mack*, 428 N.E.2d at 1372; *W & W Livestock Enters., Inc. v. Dennler*, 179 N.W.2d 484 (Iowa 1970) (awarding purchase price where pigs so infected with disease as to be worthless)).

In certain circumstances, the buyer may also recover incidental and consequential damages. Ind. Code § 26-1-2-714(3). "Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." *Id*. at § 2-715(1). Similarly, consequential damages consist of "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and injury to person or property proximately resulting from any breach of warranty." *Id*. at § 2-715(2).

As clearly enumerated in the statute, consequential damages are limited by the buyer's responsibility to cover or otherwise mitigate its damages. *See Id.* at § 2-715 cmt. 2 ("[§ 2-715(2)] . . . [requires] first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise."); *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1052 (Ind. Ct. App. 2009) (limiting buyer's consequential damages where buyer could have mitigated its damages).

In the present case, Keller Farms wanted to purchase 7 calves at $200 each, for a gross amount of $1400, with the animals being of such quality that they would eventually be able to produce milk. BHLC, however, delivered 7 calves that could never produce milk, worth only $280.25 in total.[19] The measure of Keller Farms' direct damages for BHLC's breach of warranty, therefore, is $1119.75—the difference between the value the goods would have had if

_____

[19] Since the calves had just been purchased at auction, their true value cannot be seriously challenged.

they had been as warranted ($1400) and their value as accepted ($280.25). Furthermore, Keller Farms is entitled to recover the $200 in transportation costs (consisting of the $100 payment to BHLC to have the calves delivered and an equal amount presumably incurred in shipping them to slaughter) as incidental damages, because this is a "reasonable expense incident to the . . . breach." Ind. Code § 26-1-2-715(1). *See Larsen v. A.C. Carpenter, Inc.*, 620 F. Supp. 1084, 1131 (E.D.N.Y. 1985) (awarding transportation fees for goods as incidental damages to breach of warranty); *cf. Coyle Chevrolet Co. v. Carrier*, 397 N.E.2d 1283, 1286-87 (Ind. Ct. App. 1979) (awarding sales tax as incidental damages for breach of warranty on automobile).

Similarly, Keller Farms is entitled to recover limited consequential damages. The evidence establishes that Keller Farms incurred costs of $2.48 per day per calf on feed and other expenses. It is apparently undisputed that, because the 7 calves had been given penicillin injections, Keller Farms had to wait at least thirty days before it could cover or mitigate its damages by re-selling the calves for slaughter. *See* Ind. Code § 26-1-2-715(2); *Irmscher Suppliers, Inc.*, 909 N.E.2d at 1052. Keller Farms is therefore entitled to recover $520.80 as consequential damages: the cost of raising the 7 calves for thirty days at $2.48 per day until the earliest point at which they could have mitigated their damages by re-selling the calves.[20]

To summarize, Keller Farms is entitled to $1119.75 in direct damages, $200 in incidental damages, and $520.80 in consequential damages, for a total of $1840.55, on the breach of warranty claim for the 7 calves.

### 4. The Breach of Contract Claim

Turning to this claim, Keller Farms is confronted with a legal proposition they apparently

---

[20] The evidence reveals that freemartins are promptly sold for slaughter. The fact that Keller Farms actually, and inexplicably, kept the calves for months cannot form the basis for increased damages.

overlooked—§ 2-607(a)(3) unambiguously requires the buyer to give the seller notice of *any* breach—including a breach of contract—or else be barred from *any* remedy. *See Whitwell*, 2009 WL 4894575, at *4-5; *Lemon*, 2005 WL 2218359, at *2; *McClure Oil Corp.*, 515 N.E.2d at 554; *Peavey Electronics Corp.*, 10 So.3d at 960; *see also* § 2-714.  Because it is undisputed that Keller Farms only gave notice with respect to the January 31, 2007, calves, the breach of contract claim similarly fails with respect to all but the 7 calves.

With respect to the 7 calves, therefore, § 2-714 allows Keller Farms to recover damages "for any nonconformity of tender," which includes "any failure of [BHLC] to perform according to [its] obligations under the contract." *Id*. at cmt. 2.  The only argument Keller Farms made to show that the calves were non-conforming, however, was their claim that the contract term "Holstein heifer" clearly required the tendering of "dairy replacement heifers" and not freemartins.  As the Court has already determined, the contract term "Holstein heifer" commonly means a female calf of the Holstein breed that has not reproduced and thus can include freemartins.[21]  Based on their narrow argument, Keller Farms has failed to show non-conformity and thus their breach of contract claim fails.

## B. Actual Fraud Against BHLC and Merv

### 1. Applicable Law

To prove actual fraud, Keller Farms must establish: (1) a material representation of a past or existing fact which; (2) was false; (3) was made with knowledge or reckless ignorance of its falsity; (4) was made with the intent to deceive; (5) was reasonably relied upon by the complaining party, and; (6) proximately caused injury to the complaining party. *Bilimoria*

---

[21] In particular, Keller Farms' expert, a veterinarian, directly linked the term freemartin with the term heifer in his report. (See Defs.' Ex. J.)

*Computer Sys., LLC v. Am. Online, Inc*., 829 N.E.2d 150, 155 (Ind. Ct. App. 2005).

"To demonstrate reasonable reliance, the plaintiff must show not only that he in fact relied on the misrepresentations, but also that he had a right to rely on them." *McWaters v. Parker*, 995 F.2d 1366, 1372 (7th Cir. 1993). Reasonable reliance, therefore, consists of two separate inquiries—"the fact of reliance and the right of reliance." *Lycan v. Walters*, 904 F. Supp. 884, 904 (S.D. Ind. 1995) (citing *Puller Mortg. Assocs., Inc. v. Keegan*, 829 F. Supp. 1507, 1521 (S.D. Ind. 1993).

"The fact of reliance is simply that a plaintiff relied on a misstatement . . . ." *Lycan*, 904 F. Supp. at 904. If, however, a party to a contract has expressly disclaimed any reliance on extraneous oral representations in an integration clause and disclaimer of reliance, it is generally barred from later repudiating that disavowal and alleging fraud. *Circle Centre Dev. Co. v. Y/G Ind. L.P.*, 762 N.E.2d 176, 180-81 (Ind. Ct. App. 2002). The party alleging fraud may invalidate the disclaimer of reliance by showing that it had a right to rely on the alleged extraneous statements and in fact relied on them *in executing the disclaimer of reliance*. *Id*. Stated differently, "the fraud must have induced or produced the execution of the . . . disclaimer or contributed to it as a cause." *Id*. "Additionally, it must appear that the misrepresentation was made with the intent that it should be acted on . . . in the execution of the disclaimer." *Id*.

Absent evidence that it was fraudulently induced to agree to the integration clause and disclaimer, a plaintiff alleging fraud will not be permitted to introduce any extrinsic evidence of the alleged reliance on the misrepresentations. *See Nightingale Home Healthcare, Inc. v. Anodyne Therapy*, LLC, 589 F.3d 881, 885 (7th Cir. 2009) ("[Disclaimer of reliance clauses] serve a legitimate purpose in closing a loophole in contract law by heading off a suit for fraud

used as a device for trying to get around the limitations that the parol evidence rule and contract integration clauses place on efforts to vary a written contract on the basis of oral statements made in the negotiation phase.") (internal quotations omitted).

In evaluating whether a party had the right to rely on allegedly fraudulent statements, courts have consistently noted that "[a] person has a right to rely upon representations where the exercise of reasonable prudence does not dictate otherwise." *Wright v. Pennamped*, 657 N.E.2d 1223, 1231 (Ind. Ct. App. 1995) (quoting *Voorhees v. Cragun*, 112 N.E. 826, 828-29 (Ind. Ct. App. 1916)) Thus, the buyer of goods is generally entitled to rely on representations by the seller, and even the buyer's failure to independently investigate will not necessarily render the buyer's reliance unreasonable. *See Field v. Mans*, 516 U.S. 59, 73-75 (1995) (discussing common law rules and collecting cases); RESTATEMENT (SECOND) OF TORTS § 540 ("The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.") "[T]he requirement of reasonable prudence in business transactions is not carried to the extent that the law will ignore an intentional fraud practiced on the unwary." *Wright v. Pennamped*, 657 N.E.2d 1223, 1231 (Ind. Ct. App. 1995).

However, "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." RESTATEMENT (SECOND) OF TORTS § 541. "[I]f the plaintiff wants more detail than has been provided, or is on notice that the representation is doubtful because it is improbable . . . the trier of fact my be permitted to find that reliance without investigation was not justified . . . ." DAN B. DOBBS, THE LAW OF TORTS § 475 (2001). "[W]hen both parties are dealing at arm's length and one party, in

spite of the facts well known to him, deliberately ignores such facts and chooses to believe statements to the contrary, he closes his eyes to the truth and deliberately takes a chance. It then cannot be said that he was injured in law. All that can be said is that he gambled and lost." *Plymale v. Upright*, 419 N.E.2d 756, 761 (Ind. Ct. App. 1981). *See Smith v. Duffey*, 576 F.3d 336, 339 (7th Cir. 2009) (finding no reasonable reliance because "no businessman in his right mind" could believe that the value of his shares of stock would be unaffected by a split); *Urschel Farms, Inc.*, 858 F. Supp. at 839-40 (stating that it is a "fantastic proposition" for experienced farmers to rely on a guarantee that pigs where disease free, even though they detected signs of disease in the herd); *Plumley v. Stanelle*, 311 N.E.2d 626, 630-31 (Ind. Ct. App. 1974) ("There can be no recovery for misrepresentations where the hearer had ample reason to doubt their truth.").

With these principles in mind, the Court will address Keller Farms' fraud claim.

### 2. Keller Farms has Failed to Prove Its Actual Fraud Claims

Keller Farms' actual fraud claims fail on multiple grounds. To begin, because the contract term "Holstein heifer" merely contemplates the sale of Holstein calves that have not reproduced—but makes no guarantee that the calves are "dairy replacement heifers," let alone are suitable for milk production—there is no actual fraud on the face of the contract. Furthermore, because the contracts contain a valid integration clause and disclaimer of reliance which Keller Farms did not attempt to overcome, it is unable to show that it in fact relied on the allegedly fraudulent statements. Similarly, even if Keller Farms did in fact rely on the statements, it did not have the right to do so.

As the Court has already determined, in this context the contract term "Holstein heifer"

means only that they are female calves of the breed Holstein that have not reproduced and it does not mean that they are suitable for dairy production, or that (based on that description) are not freemartins. Because Keller Farms undisputably received Holstein heifers from BHLC, there is no actual fraud on the face of the sales contracts.

Keller Farms is similarly unable to prove that it reasonably relied on the allegedly fraudulent misrepresentations. In each transaction, the sales contract provided that "[Keller Farms] has not [relied] upon or been induced by any statements or representations of any person regarding the livestock or goods other than those statements and representations expressly set forth in writing hereon." With this disclaimer of reliance, Keller Farms is presumptively barred from introducing any evidence that it in fact relied on extraneous representations by BHLC or Merv, unless the assent to the disclaimer itself was obtained through fraud. *See Nightingale Home Healthcare, Inc.*, 589 F.3d at 885; *Circle Centre Dev. Co.*, 762 N.E.2d at 180-81.

At trial, Keller Farms presented no evidence, or even argument, that the alleged fraud induced it to disclaim reliance. With the disclaimer of reliance intact, Keller Farms could not—and did not—introduce any parol evidence to show that it in fact relied on the allegedly fraudulent misrepresentations. Accordingly, with no evidence that Keller Farms relied on any statements other than those contained on the face of the contract, the actual fraud claims fail at the outset.

Even assuming, *arguendo*, that Keller Farms introduced evidence to show it in fact relied on the extraneous statements, its claims would still fail because it did not have the right to rely on such representations in purchasing the calves. Although a buyer is generally not required to investigate the goods before purchase, a buyer may not turn a blind eye to a known risk and later

claim he was defrauded. *Plymale*, 419 N.E.2d at 761; RESTATEMENT (SECOND) OF TORTS § 541.

Tellingly, Keller Farms offered no evidence or argument on this element of the tort, perhaps recognizing that such reliance would have been unreasonable. After all, the Kellers are experienced, knowledgeable dairymen and savvy agribusiness entrepreneurs who certainly knew BHLC was selling calves at below-market prices. Indeed, the Kellers specifically sought out "budget" calves instead of those with a documented genetic history. The Kellers knew that the breedability of the calves was not guaranteed and they never asked for any information on the calves' parentage or history.

Moreover, the Kellers apparently never even questioned why so many of the calves they were purchasing were conspicuously marked with pink, and, remarkably, they were not even put off from buying calves when told they could not tube them because they were being sold "as-is." It is simply not reasonable for experienced dairy farmers, aware of the possibility of freemartinism, to say that they relied on a statement concerning the suitability of a calf for milk production from a person or entity, who at the same time, would not permit them to perform a simple, verifying inspection. Indeed, it is a stretch of the imagination to say that *any* buyer who blindly accepts the words of a seller after being affirmatively prevented from inspecting the goods has acted reasonably.[22] *See Urschel Farms, Inc.*, 858 F. Supp. at 839-40 (finding no reasonable reliance where buyers detected signs of illness in hogs, yet relied on seller's representation they were disease-free); *cf. Smith*, 576 F.3d at 339; *Wheatcraft v. Wheatcraft*, 825 N.E.2d 23, 32 n.3 (Ind. Ct. App. 2005) (stating that it would be unreasonable for ex-wife to rely

---

[22] Keller Farms never really claimed that its reliance on the purported statements of Steve (or Merv) was reasonable, presumably because of these essentially undisputed facts.

on ex-husband's own valuation of his business for purposes of divorce settlement). In short, on these facts, Keller Farms' reliance was not reasonable. *See* DAN B. DOBBS, THE LAW OF TORTS § 475 (2001).

To summarize, there is no actual fraud on the face of the contracts and Keller Farms has failed to show that it reasonably relied on any alleged misrepresentations.

## C. Constructive Fraud Against BHLC and Merv

### *1. Applicable Law*

Generally, constructive fraud requires: (1) a duty owed by the party to be charged to the complaining party due to their relationship, (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists, (3) reasonable reliance thereon by the complaining party, (4) injury to the complaining party as a proximate result thereof, and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996); *Wheatcraft v. Wheatcraft*, 825 N.E.2d 23, 30 (Ind. Ct. App. 2005).

The existence of the required duty may arise in one of two ways. First, a fiduciary relationship, such as attorney and client, doctor and patient, or principal and agent, may give rise to the required duty. *Sanders v. Townsend*, 582 N.E.2d 355, 358 (Ind. 1991). However, the necessary duty does not arise between parties to an arms-length business transaction. *Olcott Intern. & Co., Inc. v. Micro Data Base Systems, Inc*., 793 N.E.2d 1063, 1073 (Ind. Ct. App. 2003) (citing *Comfax Corp. v. North American Van Lines, Inc.*, 587 N.E.2d 118, 125-26 (Ind. Ct. App. 1992); *French v. Hickman Moving & Storage,* 400 N.E.2d 1384, 1389 (Ind. Ct. App. 1980)).

Alternatively, "in the case where there is a buyer and a seller, [the necessary duty exists] where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *Strong v. Jackson*, 777 N.E.2d 1141, 1147 (Ind. Ct. App. 2002) (citing *Epperly v. Johnson*, 734 N.E.2d 1066, 1073 (Ind. Ct. App. 2000)); *see also Wells v. Stone City Bank*, 691 N.E.2d 1246, 1251 (Ind. Ct. App. 1998). In cases involving a buyer and seller, a constructive fraud may arise where "(1) a seller makes unqualified statements to induce another to make a purchase; (2) the buyer relies upon the statements; and (3) the seller has professed to the buyer that he has knowledge of the truth of those statements." *Am. Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 247 (Ind. Ct. App. 2010) (citing *Stoll v. Grimm*, 681 N.E.2d 749, 757 (Ind. Ct. App. 1997)); *see also Mullen v. Cogdell*, 643 N.E.2d 390, 401 (Ind. Ct. App. 1994) (collecting cases ). Constructive fraud between a buyer and seller cannot be based on a failure to speak, but instead requires an affirmative representation by the seller. *Plohg v. NN Investors Life Ins. Co.*, 583 N.E.2d 1233, 1236 (Ind. Ct. App. 1992) (citing *Whiteco Properties, Inc. v. Thielbar*, 467 N.E.2d 433 (Ind. Ct. App. 1984); *Coffey v. Wininger*, 296 N.E.2d 154 (Ind. Ct. App. 1973)). Furthermore, in an action based on misrepresentations between a buyer and a seller, unlike cases of constructive fraud based on a fiduciary relationship, the plaintiff bears the burden of proving every element of its claim. *Strong*, 777 N.E. 2d at 1147.

As with actual fraud, constructive fraud requires reasonable reliance. "While [t]he law is designed to protect the weak and credulous from the wiles and stratagems of the artful and cunning, it will not protect those who stand mentally on equal footing and in no fiduciary relation, if they fail to exercise common sense and judgment." *Am. Heritage Banco, Inc.*, 928 N.E.2d at 248 (quoting *Ehle v. Ehle*, 737 N.E.2d 429, 435 (Ind. Ct. App. 2000). *See Smith*, 576

F.3d at 339; *Urschel Farms, Inc.*, 858 F. Supp. at 839-40; *Plymale,* 419 N.E.2d at 761;

RESTATEMENT (SECOND) OF TORTS § 541.

### 2. The Constructive Fraud Claim Against BHLC and Merv Also Fails

The constructive fraud claim against BHLC and Merv is similarly unsuccessful.  At trial,

Keller Farms failed to address the crucial element of a claim for constructive fraud—the

existence of a duty owed by BHLC and Merv to the Kellers.[23]  Indeed, there is no evidence in the

record to suggest that BHLC and Merv had any sort of fiduciary relationship with the Kellers.

Rather, it plainly appears that the relationship between BHLC, Merv, and the Kellers was merely

that of buyer and seller.

Because there is no fiduciary relationship between BHLC, Merv, and the Kellers, the

constructive fraud claim cannot be based on the simple failure of BHLC or Merv to disclose

information about the calves. *Plohg*, 583 N.E.2d at 1236.  Rather, BHLC or Merv must have

made an affirmative misrepresentation to the Kellers. *Id*.  However, there is no probative

evidence that Merv made *any* statements to the Kellers about the calves, except to tell them that

the calves could not be tubed because they were being sold "as-is."  Similarly, Keller Farms has

failed to show that BHLC (through its agents, Steve and Brigitte) made any affirmative

misrepresentations regarding the suitability of the calves for dairy production.

Even if Keller Farms had introduced evidence to show affirmative misrepresentations,

they must still show that, as with actual fraud, it reasonably relied on the statements.  That is,

Keller Farms must have in fact relied on the alleged misrepresentations and had the right to do

---

[23] Throughout, Keller Farms generally failed to distinguish between actual and constructive fraud and made no mention of constructive fraud in its Trial Brief (Docket # 98) or in its Proposed Findings of Fact and Conclusions of Law. (Docket # 103.)

so.  As previously noted, however, the valid integration clause and disclaimer of reliance in the sales contracts prevented Keller Farms from introducing any evidence to show reliance in fact on any allegedly fraudulent statements.  Furthermore—and regardless of the application of the integration clause and disclaimer of reliance—Keller Farms, as just discussed, has failed to prove that it had a right to rely on the alleged misrepresentations.

Without any evidence that BHLC or Merv made any affirmative statements to Keller Farms, or that, even if such statements were made, that they were reasonably relied upon, the constructive fraud claims also fail.

## D. Piercing the Corporate Veil of BHLC

### 1. Applicable Law

Ordinarily, corporate officers and shareholders are not personally liable for the debts or acts of a corporation. Ind. Code § 23-1-26-3(b); *Comm'r, Dept. of Envtl. Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 559 (Ind. 2001).  Rather, shareholders and corporate officers are generally only liable for misconduct which they have participated in, authorized, or directed. Ind. Code § 23-1-26-3(b); *Comm'r, Dept. of Envtl. Mgmt*, 755 N.E.2d at 559.  *See also Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1236 n.7 (Ind. 1994) (holding that corporate officer can be personally liable for inducing the corporation to breach its contract if he is acting outside the scope of his official duties or for personal gain).

In certain circumstances, however, the doctrine of "piercing the corporate veil" may be invoked to disregard the corporate entity and to hold shareholders personally liable for the actions of the corporation. *Comm'r, Dept. of Envtl. Mgmt*, 755 N.E.2d at 563.  As a general rule, however, Indiana courts are reluctant to disregard corporate identity, *Four Seasons Mfg., Inc. v.*

*1001 Coliseum, LLC*, 870 N.E.2d 494, 504 (Ind. Ct. App. 2007), and will only do so after a highly fact-sensitive inquiry. *Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd.*, 768 N.E.2d 463, 468 (Ind. Ct. App. 2002).

"In determining if the party seeking to pierce the corporate veil has met its burden, Indiana courts consider whether the party has presented evidence showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form." *Cmty. Care Ctrs., Inc. v. Hamilton*, 774 N.E.2d 559, 564-65 (Ind. Ct. App. 2002). *See also Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994); *Smith v. McLeod Distrib., Inc*., 744 N.E.2d 459, 463 (Ind. Ct. App. 2000).

### 2. The Corporate Veil of BHLC Will Not be Pierced

Keller Farms has failed to carry its burden to show that BHLC's corporate veil should be pierced to hold Brigitte personally liable. To begin, Keller Farms failed to present any evidence that BHLC was undercapitalized during the transactions, offered no evidence about what an adequate level of capitalization should be for such a company, and, in fact, the corporation (which owned a farm and acreage) appears to have been sufficiently capitalized.

Keller Farms has similarly failed to present any evidence that Brigitte did not observe required corporate formalities. To the contrary, BHLC was incorporated by an attorney as a Subchapter S corporation, observed corporate and financial formalities, and remained in good

standing with the Indiana Secretary of State. Moreover, BHLC held itself out as a corporation during its dealings with the Kellers, retained its livestock dealer registration with the Department of Agriculture, and secured the statutorily-required bond.

Furthermore, there is no evidence that Brigitte, BHLC's sole shareholder and director, made any fraudulent representations to Keller Farms or used the corporation as a vehicle to promote fraud. *See Cmty. Care Ctrs.*, 774 N.E.2d at 564-65 (noting "fraudulent representation by corporation's *shareholders or directors*" as a factor to support veil piercing). Indeed, the undisputed evidence shows that Brigitte never had any contact with the Kellers.

At most, Keller Farms has shown that Brigitte paid some personal expenses from the BHLC corporate account, but these were fully accounted for on BHLC's income tax returns, and besides, were primarily done for convenience and not in disregard of the corporate form. *See Cmty. Care Ctrs.*, 774 N.E.2d at 568-69 (finding such practices "typical of family run corporations" and that payment of personal expenses, if accounted for on corporation's balance sheet, does not support veil-piercing). Accordingly, this factor, the only one Keller Farms truly presses, does not warrant piercing the corporate veil to hold Brigitte personally liable.

In short, Keller Farms has failed to support its claim to pierce the corporate veil of BHLC. Accordingly, Brigitte cannot be held personally liable for BHLC's breach of implied warranty.

## IV. CONCLUSION

In conclusion, based on the foregoing, BHLC is liable to Keller Farms in the amount of $1840.55 for the breach of the implied warranty on the 7 calves purchased on January 31, 2007. Defendants Brigitte Holmes and Mervin Mishler are not liable to Keller Farms and Keller Farms

shall take nothing from them on its complaint.  Accordingly, the Clerk is directed to enter

judgment in favor of LDT Keller Farms, LLC and the Keller Farms Partnership and against the

Brigitte Holmes Livestock Company, in the amount of $1840.55.  The Clerk is also directed to

enter judgment in favor of Brigitte Holmes and Mervin Mishler and against LDT Keller Farms,

LLC and the Keller Farms Partnership.


      SO ORDERED.

      Enter for March 30, 2011.

                          S/Roger B. Cosbey
                          Roger B. Cosbey,
                          United States Magistrate Judge